FILED
2022 Sep-15  AM 08:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| BRANDON ADAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:20-cv-00808-AKK-JHE |
| | ) | |
| OFFICER J. STEPHENS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION**

Plaintiff Brandon Adams has filed a *pro se* amended complaint under 42 U.S.C. § 1983 for violations of his civil rights. (Doc. 16). He names the following defendants in the amended complaint: the Alabama Department of Corrections ("ADOC"); Wexford Health Sources, Inc. ("Wexford"); Mental Health Professional Jefferson Spencer; Lieutenant Carl Sanders; Sergeant March Jones; Correctional Officer Quentin Jackson; Correctional Officer Justin Stephens; and Correctional Officer Kennedy Roy. (Doc. 16 at 2–3, 16–17). Adams seeks monetary and injunctive relief. (Doc. 16 at 5, 19). The amended complaint is before the undersigned magistrate judge for a preliminary report and recommendation. *See* 28 U.S.C. § 636(b)(1); *McCarthy v. Bronson*, 500 U.S. 136 (1991). For the reasons to follow, the undersigned recommends the court grant in part and deny in part the defendants' motions for summary judgment.

**I. Procedural History**

On March 16, 2021, the undersigned entered an Order for Special Report, directing the Clerk to forward copies of the amended complaint to each of the named defendants and directing the defendants to file a Special Report addressing Adams's factual allegations. (Doc. 17).

On April 6, 2021, defendants Wexford and Spencer filed a Special Report with supporting

evidence.  (Doc. 25).  On September 28, 2021, defendants Sanders, Jones, Roy, Jackson, and Stephens filed a Special Report with supporting evidence.[1]  (Doc. 40).  On September 29, 2021, the undersigned construed the Special Reports as motions for summary judgment and notified Adams that he had 21 days to respond to the motions for summary judgment by filing affidavits or other evidence.  (Doc. 41).  The undersigned also advised Adams of the consequences of any default or failure to comply with Rule 56.  (Doc. 41).; *see Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985).

On November 1, 2021, the court received Adams's motion for an extension of time to file a response to the defendants' motions for summary judgment.  (Doc. 43).  Adams explained that he was in a crisis cell from October 13, 2021, to October 26, 2021, and requested a 90-day extension of time to file a response.  (Doc. 43).  On the same day, the undersigned granted in part and denied in part Adams's motion for an extension of time and allowed him an additional 45 days to file a response.  (Doc. 44).  The undersigned also provided instructions to Adams again on how to respond to the motions for summary judgment.  (Doc. 44).  The court received no response from Adams within the allotted time.

On February 4, 2022, the court received Adams's motion for appointment of counsel and an extension of time to respond to the defendants' motions for summary judgment.  (Doc. 45).  Adams alleged that he was assigned to a mental health restricted housing unit and did not have access to the prison law library.  (Doc. 45 at 1–2).  He further alleged that defendant Sanders and a non-defendant would not allow inmates in the unit to order any legal materials or the library clerk to pass out legal materials in the unit.  (Doc. 45 at 1–2).

---

[1] The following day, the ADOC defendants notified the court that Exhibit A to their Special Report was erroneously duplicated and replaced the exhibit with a corrected one.  (Doc. 42).

On February 14, 2022, the undersigned ordered defendant Sanders to notify the court, in writing, whether Adams had access to the law library and/or legal materials while housed in the mental health restricted housing unit.  (Doc. 46 at 1).  If Adams did not have access to the law library or legal materials, the undersigned further ordered Sanders to notify the court of the specific reasons Adams did not have access to the law library or legal materials and an approximate date when he would have access to the same.  (Doc. 46 at 1–2).

On March 7, 2022, defendant Sanders filed a response and affidavit stating that he had not denied Adams access to legal materials or the prison law library.  (Doc. 47-1, Sanders Aff.). Sanders explained that when an inmate is housed in a special housing unit, the inmate must submit an Inmate Request Slip to the law library, which Sanders does not see.  (Doc. 47-1, Sanders Aff.). Sanders asserted that the institutional inmate law clerk also makes rounds regularly in the special housing units to assist inmates as needed with legal services.  (Doc. 47-1, Sanders Aff.).  Based on Sanders's affidavit, and Adams's failure to specifically allege that he submitted an Inmate Request Slip to the law library and was denied, the undersigned denied Adams's motion for appointment of counsel.  (Doc. 48 at 2).  However, the undersigned granted in part and denied in part Adams's motion for an extension of time to respond to the defendants' motions for summary judgment and allowed him 21 days to file a response.  (Doc. 48 at 2).  That deadline passed without a response from Adams.

On August 8, 2022, Adams informed the court that he never received the defendants' Special Reports and requested that the court mail him the Special Reports and allow him 60 days to file a response.  (Doc. 51 at 1).  On August 11, 2022, the undersigned granted in part and denied in part Adams's motion for an extension of time.  (Doc. 52 at 2).  Specifically, the undersigned directed the Clerk to mail Adams a copy of the defendants' Special Reports, along with the

3

September 29, 2021 order construing the Special Reports as motions for summary judgment and informing Adams of his responsibilities in filing a response to the motions for summary judgment. (Doc. 52 at 2).  The undersigned allowed Adams 21 days to file a response.  (Doc. 52 at 2).  On September 6, 2022, the court received Adams's response.[2]  (Doc. 53).  This matter is now before the court on the defendants' motions for summary judgment and Adams's response.

## II.  Standard of Review

Because the court has construed the defendants' Special Reports as motions for summary judgment, Federal Rule of Civil Procedure 56 governs the motions.  Under Rule 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In making that assessment, the court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences against the moving party. *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000).  The moving party has the initial burden of showing there are no genuine issues of material fact and he is due to prevail as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  The plaintiff has the ultimate burden of proving his claims, so the moving party will be entitled to judgment as a matter of law on any claim unless the plaintiff is able to show some evidence supporting each element of that claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Bennett v. Parker*, 898 F.2d 1530, 1532–33 (11th Cir. 1990).  As the Eleventh Circuit has explained:

---

[2] The undersigned has no information about the date Adams gave his response to prison officials for mailing.  However, Adams's affidavit, which is attached to his response, is dated August 24, 2022.  (Doc. 53 at 7).  Accordingly, the response is deemed filed on that date.  *See Houston v. Lack*, 487 U.S. 266, 275–76 (1988) (a *pro se* inmate's document is deemed filed the date it is delivered to prison officials for mailing); *Adams v. United States*, 173 F.3d 1339, 1341 (11th Cir. 1999); *Garvey v. Vaughn*, 993 F.2d 776, 780–82 (11th Cir. 1993).

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett*, 898 F.2d at 1532 (citations and internal quotations omitted).

In determining whether to grant summary judgment, however, the court will consider any "specific facts" pled in a *pro se* plaintiff's sworn complaint. *See Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986)). Additionally, because the plaintiff is *pro se*, the court must construe the complaint more liberally than a pleading drafted by a lawyer. *Hughes v. Rowe*, 449 U.S. 5, 9 (1980).

### III. Summary Judgment Facts[3]

When the events alleged in the amended complaint occurred, Adams was incarcerated at W.E. Donaldson Correctional Facility. (Doc. 16 at 4). Adams was previously diagnosed with a mental illness and prescribed medications. (Doc. 16 at 11).

Medical records indicate that on April 17, 2020, about 11:00 a.m., prison staff requested that medical staff complete a body chart documentation form on Adams for self-inflicted wounds, but Adams refused. (Doc. 25-2 at 18). Medical staff noted "[s]mall pea sized" bloody areas on Adams's left wrist but stated that they were unable to assess him further. (*Id.*). In a Refusal of Responsibility Form, medical staff noted that Adams refused assessment for self-inflicted wounds to his left wrist, and he also refused a tetanus vaccine and assessment for a body chart. (Doc. 25-

---

[3] Pursuant to the foregoing summary judgment standard, the following facts are undisputed or, if disputed, taken in a light most favorable to the plaintiff. Factual disputes are addressed in footnote form.

2 at 17).  Four members of the prison and/or medical staff witnessed Adams's refusal to accept medical treatment and to sign the form.  (*Id.*).

On the same day, medical staff completed an urgent referral to Mental Health regarding Adams.  (Doc. 40-1 at 11).  Adams was escorted to the Mental Health Unit to speak with Jefferson Spencer, a mental health professional.  (Doc. 16 at 11).  Adams informed Spencer that he was suicidal and showed Spencer where he had cut his wrist.  (*Id.*).  Spencer asked Adams to speak with him, but Adams refused.  (*Id.*).  As a result, Spencer instructed correctional officers to escort Adams back to his cell.[4]  (*Id.*).  While Adams was sitting in a chair waiting to be escorted back to his cell, he cut his wrist again "in front of other mental health professionals."  (Doc. 16 at 11).

Ms. R. Brewster, a mental health professional, documented what transpired next:

(S)     Today LMHP [licensed mental health professional] spoke with Mr. Adams in the corridor.  When LMHP noticed blood on his arms, she asked, why is Mr. Adams sitting here bleeding?  CO [Correctional Officer] stated, "I don't know." LMHP then asked Mr. Adams, why are you sitting here bleeding?  Mr. Adams replied, "I don't know.  I told them I'm suicidal.  Everybody that walked by, I told them.  They didn't do anything.["]  [A]sked the clinic Nurse, are you able to clean and bandage his wounds?  LMHP then turned and asked the clinic Nurse,  are you able to clean and bandage his wounds?  As LMHP turned back to Mr. Adams, she noticed Mr. Adams placing what appeared to be a half piece of razor into his mouth. LMHP returned to the LMHP Office to acquire gloves.  Mr. Adams had been escorted into the clinic when LMHP returned.  LMHP asked Mr. Adams to give up the razor he placed into his mouth.  Mr. Adams replied, "I can't.  I swallowed it." Nurse Hallmark informed LMHP that she would let the doctor know that Mr. Adams needs an X-ray.

(O)     Mr. Adams had tears in his eyes.  His mood was depressed with appropriate affect.  He was appropriately dressed in his state issued prison khaki shirt with a white t-shirt underneath and his khaki pants.  His eye contact was intermittent, as he sometimes dropped his head in despair.  His speech was clear and his voice tone was low and slow.  Mr. Adams was too distraught to complete the SRA [Suicide Risk Assessment].

---

[4] Spencer states that there are no records in Adams's mental health chart that indicate he saw or assessed Adams on April 17, 2020.  (Doc. 25-1, Spencer Decl. at 5).  However, the Mental Health Referral Form completed by medical staff on April 17, 2020 reflects that Adams was "seen by MHP Spencer for SRA [Suicide Risk Assessment]."  (Doc. 40-1 at 11).

(A)     Since Mr. Adams has a DX: of Major Depressive Disorder w'
Psychosis, he had fresh superficial scratches dripping blood on his wrist, repeatedly
verbalized "I'm depressed.  I'm suicidal[,]" and possibly still has a half piece of a
razor,  I determine his current risk of suicide attempt to be moderate, and he is being
placed on Non-Acute Suicide Watch @ 12:34 pm.  Since LMHP omitted the level
of Non-Acute Suicide Watch on first Communication Form, a second form was
completed with the addition of the word "him on Non-Acute SW."

(P)     A Body Chart was completed on Mr. Adams, and he was escorted to Crisis.

(Doc. 25-2 at 22).

Brewster completed a Health Services Communication Form directing that Adams be placed in a crisis cell and a security watch be conducted at 15-minute intervals.  (Doc. 25-2 at 25). Brewster noted that Adams should be provided a safety smock, mattress, and blanket, but personal items, belts, strings, or "sharps" were prohibited.  (*Id*.).  Brewster also instructed staff twice on the form to thoroughly check Adams and his cell before placement.  (*Id*.).

Nurse Hallmark assessed Adams for self-inflicted wounds.  (Doc. 25-2 at 19).  Hallmark took Adams's vital signs and noted a superficial 0.03 x 1 centimeter laceration, which she cleaned. (Doc. 25-2 at 19).  On the same day, Dr. Wilson ordered an x-ray of the soft tissue of Adams's neck, chest, kidney, ureter, and bladder ["KUB"].  (Doc. 25-2 at 20).

Defendant Stephens escorted Adams to a crisis cell.  (Doc. 16 at 14).  Adams contends Stephens did not search his person or the cell before placing him in the cell.[5]  (*Id*.).  Adams still had a razor in his possession which he later used to cut himself again.  (*Id*.).

An observer was assigned to Adams's cell.  (Doc. 40-3, Sanders Aff. at 1).  Institutional documents indicate that observers monitored Adams in the crisis cell on April 17-19, 2020, without

---

[5] Stephens states that he had no knowledge of Adams cutting himself on April 17, 2020. (Doc. 40-7, Stephens Aff. at 1).  Stephens contends that Adams was stripped searched before being placed in the crisis cell, as are all inmates who are placed in a crisis cell.  (Doc. 40-7, Stephens Add. At 1).

incident.  (Doc. 40-1 at 4–10).

On April 20, 2020, at 1:00 a.m., an observer noted that Adams had cut his wrist and was bleeding.  (Doc. 25-2 at 33).  At 1:09 a.m., medical staff conducted a nursing encounter with Adams.  (Doc. 25-2 at 33).  Adams refused to leave his cell to go to the infirmary at 5:50 a.m. (Doc. 25-2 at 33).

On April 21, 2020, Spencer conducted an individual session with Adams.  (Doc. 25-2 at 45; Doc. 25-1, Spencer Aff. at 5–6).  Spencer's progress notes state the following:

> (S)    Inmate states he's going through a lot.  States he just needs to deal with it himself.  States he cut himself in crisis.  States he's upset that MHP didn't put him [in] crisis on Friday when he cut himself.  After some discussion he revealed his goal is to get transferred to Bullock (probably referring to stabilization unit).
>
> (O)    Seen in confidential office in MH building.  Was oriented X 4, was cooperative with staff, though he would not say much about his situation.  No signs of psychosis or acute distress noted.
>
> (A)    Inmate has history of secondary gain efforts, most recently going on crisis due to his tray door not being open and complaining it's too hot in his cell.  Today he revealed his desire to transfer to Bullock.  He's been on watch 72 hours, but no referral to higher level of care is indicated at this time due to his tendency to use crisis as secondary gain.  His continued cutting makes him a risk for self harm and therefore should remain on watch.
>
> (P)    Remain NASW ["Non-Acute Suicide Watch"].

(Doc. 25-2 at 45; Doc. 25-1, Spencer Aff. at 5–6).

On the same day, medical staff assessed Adams.  (Doc. 25-2 at 46).  Progress notes indicate that Adams reportedly swallowed a razor.  (Doc. 25-2 at 46).  He denied vomiting, hematemesis, or hematochezia.  (Doc. 25-2 at 46).  Adams complained of generalized abdominal pain and did not know if he had expelled the razor in his stool.  (Doc. 25-2 at 46).  Medical staff noted that Adams had refused an x-ray the day before.  (Doc. 25-2 at 46).  Adams's vitals were within normal limits.  (*Id*.).  He appeared well and had no cuts or lacerations in his oral cavity.  (Doc. 25-2 at 46).

8

Adams stated that he would not refuse an x-ray again if staff reordered one.  (Doc. 25-2 at 46).

On April 22, 2020, Spencer conducted another individual session with Adams.  (Doc. 25-2 at 47).  Spencer's progress notes state:

(S)      "It's going I guess."  Didn't sleep well last night.  States having "crazy, suicidal thoughts."  States he's concerned about an Xray he's supposed to get because he swallowed [a razor].  States he will cut again just to show he will do it.  States most of his family is dead—mom, dad, and his child's mother.

(O)      Inmate's demeanor changed completely when he came to session—was talkative and jovial to others in the hallway.  Was oriented X 4, no signs psychosis.  No signs of recent self-harm.

(A)      Inmate most likely dramatizing his symptoms, possibly as way to go to Bullock.  ADOC lieutenant suggested that part of his problem may be the fact that he was fired as a runner on his block.

(P)      Remain NASW.

(Doc. 25-2 at 47; Doc. 25-1, Spencer Aff. at 6).

Spencer saw Adams on April 23, 2020, at about 10:17 a.m., as part of a treatment team. (Doc. 25-2 at 49, 54; Doc. 25-1, Spencer Aff. at 7).  Spencer's notes state:

S)      Inmate thinks he needs to go to Bullock—[s]tates he's feeling the same.  Asked when he's supposed to get an Xray because he swallowed a razor last Friday.  Made vague statements about having family problems.  States he's having sharp pains in his stomach.  States he just needs to deal with his problems on his own.

O)      Inmate presented depressed, was cooperative with staff.  Was oriented X4, no signs psychosis.  No signs recent self-harm.

A)      Inmate most likely dramatizing his symptoms, possibly as way to go to Bullock.  ADOC lieutenant suggested that part of his problem may be the fact that he was fired as a runner on his block.  ADOC has reported to mental health that his trip to crisis was [prompted] by his being fired from his runner job, which he denied happened.  There are also reports from ADOC that he was paid to come to crisis.  He claims he did not want to talk to anybody when he was supposed to come to tx team Monday, but observer reports state he conversed a lot with observers that day.  Inmate has been on multiple suicide watches, but due to his history of using crisis for secondary issues, no increase in level of care is required at this time.

P) Release to ADOC.

9

(Doc. 42-1 at 5; Doc. 25-1, Spencer Aff. at 6–7).

Spencer completed an abbreviated suicide/self-harm risk assessment and assessed Adams as having a moderate risk.  (Doc. 25-2 at 49).  Spencer stated again that Adams was most likely dramatizing his symptoms, possibly as a way to be transferred to Bullock.  (Doc. 25-2 at 49). Spencer also noted that ADOC staff suggested that Adams was upset due to being fired as a runner. (Doc. 25-2 at 49).  Spencer concluded that Adams's risk of suicide/self-harm had been adequately addressed and precautions could be discontinued.  (Doc. 25-2 at 49).

Dr. Graham Osula noted that Adams stated he was suicidal "'due to some things going on in the outside world.'"  (Doc. 25-2 at 48).  Adams stated that his prescribed medications made him too tired to leave his cell to see his treatment team or take his x-ray.  (Doc. 25-2 at 48).  Adams initially denied having suicidal ideations but later stated his emotions were mixed.  (Doc. 25-2 at 48).  Osula determined that Adams had situational, or non-mental health related, stressors that affected his mood.  (Doc. 25-2 at 48).  Osula stated that an "incident w/ADOC officers appears to have worsened his mood."  (Doc. 25-2 at 48).  The progress notes indicate that Adams "was very particular about not wanting to be on NASW" during his last crisis placement.  (Doc. 25-2 at 48). Osula ordered discontinuation of non-acute suicide watch for Adams and further ordered that Adams be released to ADOC at 11:15 a.m.  (Doc. 25-2 at 55).

At 10:35 a.m., Adams returned to his crisis cell.  (Doc. 25-2 at 43).  At 10:39 a.m., staff observed Adams cutting himself and alerted ADOC and mental health staff.  (Doc. 25-2 at 43). Nonetheless, it appears Adams was released from crisis at about 1:00 p.m.  (Doc. 25-2 at 43).

Adams contends that during his assignment to a crisis cell between April 17, 2020, and April 23, 2020, observers informed Sanders, Jones, Stephens, Jackson, and Roy that he had cut himself and needed a body chart.  (Doc. 16 at 12–14, 23–24).  However, these officers did not send

Adams for a body chart or remove the razor from Adams's crisis cell and allowed him to remain in the cell bleeding.[6]  (Doc. 16 at 12–14, 23–24).

On April 24, 2020, Adams was referred to Mental Health after he reported that he was suicidal and was actively cutting himself with a blade.  (Doc. 42-1 at 4).  On the same day, Spencer conducted an individual session with Adams.  (Doc. 40-1 at 14).  Spencer noted the following:

> (S)      Inmate states he cut himself and set himself on fire today, was thinking about his mom's death in 2016 and been depressed.  His story later changed to his feeling unsafe on VW—states a sergeant [whose] name he did not know threatened him last night.

> (O)      Mood: **Anxious**   Affect: **congruent**   Thought Process: **Linear**  Content: **Goal-directed**   Insight: **fair**   Behavior: **Cooperative**.  Presented with superficial cuts on his left arm.  Inmate seen in confidential office in MH building.

> (A)      Inmate recently came off of watch after it was determined he was using suicide for secondary gain.  He mentioned nothing about the above named issues in his recent . . . .

> P)      Release to ADOC for placement.

(Doc. 40-1 at 14).

On the same day, Spencer completed a suicide/self-harm risk assessment and noted that Adams did not have any recent suicide attempts or recent non-suicidal self-injury.  (Doc. 40-1 at 16–17).  Spencer further noted that Adams was depressed and anxious, and displayed rigid, all-or-nothing thinking, and he also had thoughts of self-injury, and believed death would bring relief.  (Doc. 40-1 at 16).  Spencer assessed Adams as having a moderate risk for self-harm.  (Doc. 40-1

---

[6] Sanders states that he did not observe any cuts on Adams's wrist.  (Doc. 40-3, Sanders Aff. at 1).  He contends that neither Adams nor anyone else informed him that Adams had a razor and was cutting himself.  (Doc. 40-3, Sanders Aff. at 1).  Jones and Roy also state that they had no knowledge that Adams was cutting himself or suicidal.  (Doc. 40-4, Jones Aff.; Doc. 40-5, Roy Aff.).  Jackson asserts that he was not at work on April 17, 2020, or April 23, 2020.  (Doc. 40-6, Jackson Aff.).  Jackson contends he was not advised that Adams needed medical attention.  (Doc. 40-6, Jackson Aff.).

at 17).  He noted:

> Inmate's story continues to change—ADOC reports suggest he is being paid to come on crisis for unknown reasons.  He was also fired from his runner job which prompted his placement on watch.  Moderate risk due to recent cutting, but he has no lethal plans to self harm.  He's future-oriented and goal-oriented.

(Doc. 40-1 at 17).

On April 26, 2020, Spencer conducted a follow-up session with Adams.  (Doc. 42-1 at 3).

Spencer noted the following:

> (S)    Inmate stated he's filed a federal lawsuit on MHP and other workers.  States mental health would not put him in crisis when he needed them to.  States he purposefully cut himself in front of a camera while on crisis so that he could [prove] he was being neglected.  Says he's sleeping well . . . no issues to report.
>
> (O)    Inmate was seen in confidential setting in VW block, sound machine in place for confidentiality.
>
> Mood: **"Great"**   Affect: **stable**   Appearance: **prison uniform**
> Behavior: agitated/mildly hostile   Thought Content: **goal-directed**
> Process: **linear**   Insight: **poor**   Other observations:
>
> No signs of recent self harm.
>
> (A)    No acute mental health interventions needed[.]
>
> (P)    Will see for day 2 follow up.

(Doc. 42-1 at 3).

On April 27, 2020, licensed mental health professional D. Carter conducted an individual session with Adams.  (Doc. 42-1 at 2).  Carter noted the following:

> (S)    Brandon Adams was seen out of cell in a confidential setting of the hallway of SLU for his two day follow up after being discharged from crisis.  MHP wore mask provided by Wexford Health due to COVID-19.
>
> (O)    Patient is an African-American male who was dressed in a state issued smock for safety purposes.  His mood was euthymic and his affect appropriate.  His speech was appropriate in rate and tone.  His thought process and thought content appear congruent with his mood.

(A)     Mr. Adams has a diagnosis of Adjustment Disorder and is an MH-2.  He denies any suicidal or homicidal ideation.  He says he is doing ok.

(P)     Patient will be seen for a three and ten day follow up.  He will also be followed on a regularly scheduled basis by his primary MHP.

(Doc. 42-1 at 2).

On April 28, 2020, mental health professional J. Horton conducted an individual session with Adams.  (Doc. 42-1 at 1).  Horton noted:

(S)  Pt was seen out of cell in confidential MH ofc on VW corridor with 6ft distancing and both pt and MHP wearing masks for COVID 19 precautions.

"Feeling good"

(O)  Pt is AAM in clean ADOC uniform.  Mood happy, affect congruent.  Pt is joking and jovial during this session.  Thoughts verbalized during this session are about doing more in tx to improve himself.  No SI/HI or AVH reported.  Speech normal.  Eye contact fair.  Insight fair.  Fully oriented.  Pt states he was started on new medication while on crisis and that he is adherent to tx.   No sleep or eating complaints.   No SIB verbalized or observed.   MHP asked pt about what amendments he would like to add to his tx plan since he had previously refused to see MHP and has been on and off crisis which made meeting with him to update more difficult and caused MHP and provider to implement a tx plan w/o him.  Pt expressed interest in amending plan, and MHP assisted pt in narrowing down what his focus for tx will be.  Pt decided upon identity/self-esteem and prioritization as additions he would like to add.

(A)  Pt is currently stable.  Pt has needed tx plan update but has been off and on crisis.  Tx plan needs amendment per pt's wishes verbalized today.

(P)  MHP will continue to offer pt tx in accordance with his MH code, placement and in compliance with COVID 19 precautions.  Tx put into place will be amended per pt's wishes today ASAP.

(Doc. 42-1 at 1).

Adams contends Wexford hired "unprofessional employees like Mr. Spencer" and opines that Spencer should not be employed "in the mental health field at all."  (Doc. 16 at 25).  Adams alleges Spencer disregarded his duties which "could have cost a life."  (Doc. 16 at 25).  He asserts that ADOC has also hired "unprofessional employees" who disregard their duties as correctional

13

officers.  (Doc. 16 at 26).

## IV.  Analysis

### A.      Alabama Department of Corrections

Adams argues  that the ADOC is liable for the actions of its employees who were deliberately indifferent to his serious mental health needs and safety.  (Doc. 16 at 26).  Adams's claims against the ADOC are due to be dismissed.

The Eleventh Amendment to the United States Constitution bars § 1983 claims in federal court against the state or its agencies.  *See Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100–01 (1984).   The Supreme Court has noted:

> There can be no doubt . . . that suit against the State and its Board of Corrections is barred by the Eleventh Amendment, unless Alabama has consented to the filing of such a suit.  Respondents do not contend that Alabama has consented to this suit, and it appears that no consent could be given under Art. I, § 14, of the Alabama Constitution, which provides that "the State of Alabama shall never be made a defendant in any court of law or equity."

*Alabama v. Pugh*, 438 U.S. at 782 (citations omitted).  Accordingly, Adams cannot maintain a § 1983 action against the ADOC and his claims against the Department are due to be dismissed.

### B.      Official Capacity Claims

To the extent Adams seeks damages against defendants Spencer, Sanders, Jones, Stephens, Jackson, and Roy in their official capacities (doc. 16 at 2–3, 5, 16–17), these defendants are entitled to summary judgment.  Not only does the Eleventh Amendment bar § 1983 claims against the state or an agency of the state, it also bars § 1983 claims for monetary damages brought against officials and employees of state entities sued in their official capacities.  *See Pennhurst State Sch. & Hosp.*, 465 U.S. at 101–02.  Accordingly, these individual defendants' motions for summary judgment

are due to be granted on Adams's claims against them in their official capacities for damages.  The remainder of this report and recommendation will address Adams's claims against Wexford and Spencer, Sanders, Jones, Stephens, Jackson, and Roy, in their individual capacities.

## C.    Deliberate Indifference to Mental Health Needs

Adams contends that on April 17, 2020, he informed Spencer that he was suicidal and showed Spencer where he had cut his wrist.  (Doc. 16 at 11).  Spencer asked Adams to speak with him, but Adams refused.  (*Id*.).  Spencer then instructed correctional officers to escort Adams back to his cell.  (*Id*.).  While Adams was sitting in a chair waiting to be escorted back to his cell, he cut his wrist again "in front of other mental health professionals."  (Doc. 16 at 11).  Adams alleges that defendant Spencer was deliberately indifferent to his serious mental health needs.  (Doc. 16 at 11).  Construing the facts in a light most favorable to Adams, the undersigned believes there is a genuine dispute of facts and Spencer's motion for summary judgment should be denied.

The United States Supreme Court has held that it is only deliberate indifference to serious medical needs which is actionable under 42 U.S.C. § 1983. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  A plaintiff must present evidence showing that he had a serious medical need, that the defendant acted with deliberate indifference in responding or failing to respond to that need, and that the defendant's wrongful actions caused an injury.  *See Goebert v. Lee Cty*., 510 F.3d 1312, 1326 (11th Cir. 2007). The conduct of prison officials must run counter to evolving standards of decency or involve the unnecessary and wanton infliction of pain to be actionable under § 1983. *See Bass v. Sullivan*, 550 F.2d 229, 230 (5th Cir. 1977).[7]

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

Deliberate indifference can be shown in a variety of ways.  As the Eleventh Circuit Court of Appeals noted:

> Our cases have consistently held that knowledge of the need for medical care and an intentional refusal to provide that care constitutes deliberate indifference. Medical treatment that is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness" constitutes deliberate indifference.  "A doctor's decision to take an easier and less efficacious course of treatment" also constitutes deliberate [indifference].  Additionally, when the need for medical treatment is obvious, medical care that is so cursory as to amount to no treatment at all may constitute deliberate indifference.

*Adams v. Poag*, 61 F.3d 1537, 1543–44 (11th Cir. 1995) (citations omitted).

When a deliberate indifference claim turns on the quality of the treatment provided, there is no constitutional deprivation if the medical care provided to the inmate is "'minimally adequate.'"  *Blanchard v. White Cty. Det. Ctr. Staff*, 262 F. App'x 959, 964 (11th Cir. 2008) (quoting *Harris v. Thigpen*, 941 F.2d 1495, 1504 (11th Cir. 1991)).  Deliberate indifference is not established where an inmate received care but desired different modes of treatment.  *Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1575 (11th Cir. 1985).  Neither will a mere difference of opinion between an inmate and the institution's medical staff as to treatment and diagnosis alone give rise to a cause of action under the Eighth Amendment.  *See Smart v. Villar*, 547 F.2d 112, 114 (10th Cir. 1976); *see also Estelle*, 429 U.S. at 107–08.

Moreover, mere negligence in diagnosing or treating a medical condition is insufficient to support a constitutional claim.  *See Adams*, 61 F.3d at 1543.  Similarly, an accidental or inadvertent failure to provide medical care does not constitute a wrong under the Eighth Amendment.  *See Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (citing *Estelle*, 429 U.S. at 105–06). Additionally, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner."  *Estelle*, 429 U.S. at 106.

An official also acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening or urgent medical condition that would be exacerbated by delay. *See Hill v. DeKalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002); *see also Harris v. Coweta Cty.*, 21 F.3d 388, 393–94 (11th Cir. 1994).  When a deliberate indifference claim turns on a delay in treatment, courts must consider "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." *Goebert v. Lee Cty.*, 510 F.3d at 1327.   Delay in access to medical treatment can violate the Eighth Amendment when it is "tantamount to unnecessary and wanton infliction of pain." *Brown v. Hughes*, 894 F.2d 1533, 1537–38 (11th Cir. 1990) (citations and internal quotation marks omitted).   An inmate claiming an unconstitutional delay in medical treatment "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Hill*, 40 F.3d at 1188, *overruled on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002).

"Under the Eighth Amendment, prisoners have a right to receive medical treatment for illness and injuries, which encompasses the right to psychiatric and mental health care, and a right to be protected from self-inflicted injuries, including suicide." *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994) (citations omitted).   "Prison [officials] who display deliberate indifference to the serious medical and psychiatric needs of a prisoner . . . violate the Eighth Amendment and may be liable under section 1983." *Id.* (quoting *Estelle v. Gamble*, 429 U.S. at 104–05).

The medical records reflect that Adams was previously diagnosed with a major depressive disorder with psychosis.  (Doc. 25-2 at 22).  The defendants do not dispute that he suffers from a

serious mental health need.  Construing the facts in a light most favorable to Adams, he informed Spencer on April 17, 2020, that he was suicidal and had cut himself, but Spencer refused to further assess him or take any precautionary measures to protect Adams from self-harm.

A progress note, authored by Ms. Brewster, another mental health professional, reflects that Brewster later observed Adams in the corridor with blood on his arms.  (Doc. 25-2 at 22).  When Brewster asked Adams why he was bleeding, he responded, "'I don't know.  I told them I'm suicidal.  Everybody that walked by, I told them.  They didn't do anything.['"]  (Doc. 25-2 at 22).  Brewster turned to speak to the clinic nurse.  (Doc. 25-2 at 22).  When she turned back to Adams, she noticed him placing what appeared to be a half piece of razor into his mouth.  (Doc. 25-2 at 22).  Brewster went to retrieve gloves.  (Doc. 25-2 at 22).  When she returned and directed Adams to give her the razor he put in his mouth, he responded that he had swallowed it.  (Doc. 25-2 at 22).

Spencer maintains that "[t]here is nothing in Mr. Adams' mental health chart to reveal that [Spencer] saw or assessed him on April 17, 2020."  (Doc. 25-1, Spencer Aff. at 5).  But a Mental Health Referral Form completed by medical staff on April 17, 2020, reflects that Adams was "seen by MHP Spencer for SRA [Suicide Risk Assessment]."  (Doc. 40-1 at 11).

It is well established that assessing the credibility of the allegations made by a plaintiff or a defendant is beyond the scope of a trial court's ruling on a motion for summary judgment.  *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also, Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742–43 (11th Cir. 1996).  The facts presented by the parties show that a genuine dispute exists between Adams's and Spencer's version of the facts in connection with the events that took place on April 17, 2020, and whether Spencer was deliberately indifferent to

Adams's serious mental health needs by summarily dismissing him without treatment or other precautions.  Accordingly, Spencer's motion for summary judgment is due to be denied.[8]

Spencer argues that he is entitled to qualified immunity.  (Doc. 20 at 3).  "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (internal quotation marks and citation omitted).  To obtain qualified immunity, the government official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted).  "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity in not appropriate." *Id.*

The plaintiff must show that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004) (footnote and citations omitted).  Clearly established means that when the official's conduct occurred, "'the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful.'" *Helm v. Rainbow City, Ala.*, 989 F.3d 1265, 1272 (11th Cir. 2021) (some quotation marks omitted) (quoting *District of Columbia v. Wesby*, — U.S. —, 138 S. Ct. 577, 589 (2018)).  A plaintiff can demonstrate an official was on notice regarding the constitutionality of his actions in three ways:

---

[8] Viewing Adams's amended complaint liberally, it appears that his claim against Spencer is limited to Spencer's alleged conduct on April 17, 2020.  (Doc. 16).  Specifically, Adams does not allege that Spencer was deliberately indifferent to his mental health care after he was confined to a crisis cell from April 17, 2020 to April 23, 2020.  (Doc. 16).

> *First*, the plaintiff[] may show that a materially similar case has already been decided.  *Second*, the plaintiff[] can point to a broader, clearly established principle that should control the novel facts of the situation.  *Finally*, the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary.  Under controlling law, the plaintiff[] must carry [his] burden by looking to the law as interpreted at the time by the United States Supreme Court, the Eleventh Circuit, or the [relevant State Supreme Court].

*Helm*, 989 F.3d at 1272 (quoting *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017)).

Clearly established law must be "particularized" to the facts of the case and cannot be defined "at

a high level of generality."  *Prosper v. Martin*, 989 F.3d 1242, 1251 (11th Cir. 2021) (quotation

marks and citations omitted).

Based on the facts as alleged, Adams does not dispute that  Spencer was acting within the

scope of his discretionary authority when the alleged events occurred.  While Adams has alleged

sufficient facts to establish that Spencer was deliberately indifferent to his constitutional right to

mental health care, Adams must carry his burden an additional step to show that this right was

clearly established when the incident occurred.

Years prior to the incident alleged in the amended complaint, the Eleventh Circuit held that

a failure to provide psychiatric care violates an inmate's Eighth Amendment rights. *See, e.g.,*

*Belcher v. City of Foley, Ala.*, 30 F.3d at 1396 ("Under the Eighth Amendment, prisoners have a

right to receive medical treatment for illness and injuries, which encompasses a right to psychiatric

and mental health care and a right to be protected from self-inflicted injuries, including suicide."

(citations omitted)); *Greason v. Kemp*, 891 F.2d 829, 834 (11th Cir. 1990) (holding that

"reasonable persons in appellants' positions would have known that providing an inmate with

inadequate psychiatric care could violate the inmate's eighth amendment right not to be subjected

to cruel and unusual punishment"); *see also Harris v. Thigpen*, 941 F.2d 1495, 1504 (11th Cir.

1991) ("Federal and state governments ... have a constitutional obligation to provide minimally

adequate medical care to those whom they are punishing by incarceration."). Thus, these general principles gave Spencer fair notice that a mental health professional's deliberate indifference to a prisoner's need for psychiatric and mental health care after threats of suicide and evidence of self-harm, establishes a constitutional violation. *See Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1115 (11th Cir. 2005) (citation and internal quotation marks omitted). Accordingly, Spencer is not entitled to qualified immunity and his motion for summary judgment is due to be denied.

### D.      **Wexford Health Sources, Inc.**

Adams contends Wexford hired "unprofessional employees like Mr. Spencer" and seeks to hold Wexford liable for Spencer's conduct.   (Doc. 16 at 25).  Wexford's motion for summary judgment on Adams's Eighth Amendment medical claim is due to be granted.

A corporation providing prison medical services cannot be held liable under § 1983 based on *respondeat superior* but may be liable if the constitutional violation was the result of the corporation's policy or custom. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997) (explaining that the *Monell* policy or custom requirement applies to private entities acting in place of a municipality).  In other words, a plaintiff must allege that the corporation has a policy, practice, or custom which was the moving force behind the deprivation of the plaintiff's constitutional rights. *See Craig v. Floyd Cty., Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011).  Generally, to establish a custom, a plaintiff must show a persistent and widespread practice. *See McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004). A custom is a practice that is so settled and permanent that it takes on the force of law. *See Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997).

Adams does not identify or challenge any policy or custom of Wexford.  Instead, he merely seeks to hold Wexford liable for the actions of Spencer.  Because there is no showing of a constitutional violation resulting from a policy or custom enacted by Wexford or otherwise, Wexford is entitled to summary judgment.

### E.        Failure to Protect & Deliberate Indifference to Medical Needs

Adams contends that defendant Stephens did not search him prior to placing him in a crisis cell on April 17, 2020 and, as a result, he continued to cut himself with a razor while he was confined to the crisis cell from April 17, 2020 to April 23, 2020.  (Doc. 16 at 12–14, 23–24).  He alleges observers informed defendants Sanders, Jones, Jackson, Roy, and Stephens that he had cut himself, but these defendants failed to take away the razor or escort him to the infirmary for a body chart.  (Doc. 16 at 12–14, 23–24).  Liberally construing Adams's amended complaint, he alleges the defendants failed to protect him from self-harm or obtain medical treatment for him in violation of the Eighth Amendment.  As explained below, defendant Stephens's motion for summary judgment on Adams's failure-to-protect claim concerning his placement in a crisis cell on April 17, 2020 is due to be denied.  However, the defendants' motion for summary judgment on the remainder of Adams's claims concerning his placement in the crisis cell from April 17, 2020 to April 23, 2020 is due to be granted.

The Eighth Amendment's prohibition on cruel and unusual punishment imposes upon institutional officers the duty to "take reasonable measures to guarantee the safety of the inmates" in their custody.  *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994) (internal quotation marks and citation omitted).  "'In order to state a § 1983 cause of action against prison officials based on a constitutional deprivation resulting from cruel and unusual punishment, there must be at least some allegation of a conscious or callous indifference to a prisoner's rights, thus raising the tort to

constitutional stature.'" *Williams v. Bennett*, 689 F.2d 1370, 1380 (11th Cir. 1982) (quoting *Wright v. El Paso Cty. Jail*, 642 F.2d 134, 136 (5th Cir. 1981)); *see Gullatte v. Potts*, 654 F.2d 1007, 1012 (5th Cir. 1981).  It is when institutional officials' deliberate indifference to a known danger or risk exposes an inmate to objectively, "sufficiently serious" harm, that a constitutional violation occurs. *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)); *see Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) ("When officials become aware of a threat to an inmate's health and safety, the [E]ighth [A]mendment's proscription against cruel and unusual punishment imposes a duty to provide reasonable protection.").

A danger or risk is "know[n]" only if the institutional official is both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he . . . draw[s] th[at] inference." *Farmer*, 511 U.S. at 837.  "[A]n official's failure to alleviate a significant risk that he should have perceived but did not," is not sufficient to establish liability on the part of the official.  *Id.* at 838.  Furthermore, the known risk of injury must be a "strong likelihood, rather than a mere possibility." *Edwards v. Gilbert*, 867 F.2d 1271, 1276 (11th Cir. 1989) (internal quotation marks and citations omitted).

Once it is established that an institutional official knew of a substantial danger or risk to an inmate, it must then be shown that the official was deliberately indifferent to that risk.  "[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842.  Deliberate indifference requires "a state of mind more blameworthy than negligence."  *Id.* at 835.  In the context of an inmate engaging in self-harm, "deliberate indifference requires that the defendant deliberately disregard a strong likelihood rather than a mere possibility that the self-infliction of

harm will occur." *Gish v. Thomas*, 516 F.3d 952, 954 (11th Cir. 2008) (citations and quotation marks omitted).

Finally, the plaintiff must produce sufficient evidence that the defendant's deliberate indifference to a known danger or risk caused the plaintiff's constitutional injury. *See Hale v. Tallapoosa Cty.*, 50 F.3d 1579, 1582 (11th Cir. 1995).

### 1.   Adams's Initial Placement in Crisis Cell on April 17, 2020

Adams alleges that defendant Stephens escorted him to a crisis cell on April 17, 2020, but did not search him or the cell prior to placing him inside.  (Doc. 16 at 14).  Because of Stephens's alleged failure, Adams contends he was able to bring a razor into the crisis cell and cut himself. (Doc. 16 at 14).

The medical records indicate that on April 17, 2020, Ms. Brewster completed a Health Services Communication Form directing that Adams be placed in a crisis cell and a security watch be conducted at 15-minute intervals.  (Doc. 25-2 at 25).  Brewster noted that Adams should be provided a safety smock, mattress, and blanket, but personal items, belts, strings, or "sharps" were prohibited.   (Doc. 25-2 at 25).   Brewster twice instructed staff on the Health Services Communication Form to thoroughly check Adams and his cell before placement.  (Doc. 25-2 at 25).

The record does not reflect whether Stephens saw Brewster's note reminding prison staff to check Adams and his crisis cell prior to placement and Adams does not point to any evidence that Stephens knew that he had cut himself earlier that day.  However, Stephens did not merely place Adams in a regular cell; he placed him in a crisis cell, to be  stripped of all items except for a mattress and blanket.  (Doc. 40-3, Sanders Aff. at 1).  And Stephens acknowledges that inmates are to be searched prior to placement in a crisis cell.  (Doc. 40-7, Stephens Aff. at 1).  Viewing the

facts in a light most favorable to Adams, it can be inferred that Stephens had subjective knowledge that Adams posed a substantial risk of harm to himself and/or others due to his assignment to a crisis cell, and Stephens was deliberately indifferent to that risk when he placed Adams in the crisis cell without first searching him or the cell. Consequently, Stephens's alleged failure demonstrates a deliberate disregard to a strong likelihood of harm, rather than just a mere possibility. *See Gish*, 516 F.3d at 954.

On the other hand, Stephens contends that Adams was stripped searched before he was placed in the crisis cell on April 17, 2020. (Doc. 40-7 at 1, Stephens Aff.). Thus, a genuine issue of material facts exists whether Stephens searched Adams before placing him in the crisis cell. Accordingly, Stephens's motion for summary judgment is due to be denied.[9] *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255; *see also, Mize v. Jefferson City Bd. of Educ.*, 93 F.3d at 742–43.

Neither is Stephens entitled to qualified immunity. There is no dispute that Stephens was acting within the scope of his discretionary authority when he escorted Adams to the crisis cell on April 17, 2020. *See Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994) ("discretionary authority" includes "all actions of a government official that (1) 'were undertaken pursuant to the performance of his duties,' and (2) were 'within the scope of his authority'") (quoting *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988)). Moreover, the duty of officers to take reasonable measures to protect an inmate once they become aware of a threat to an inmate's health and safety

---

[9] To be clear, the court is required to view the facts in a light most favorable to the non-moving party and the facts set forth here may or may not be the true facts. *See Sears v. Roberts*, 922 F.3d 1199, 1209 (11th Cir. 2019) ("We do not know what the true facts are, but we do know that a genuine dispute of material fact exists, and it precludes granting summary judgment to the correctional officers on [the plaintiff's] § 1983 . . . claims.").

was clearly established for years when defendant Stephens allegedly failed to search Adams before placing him in a crisis cell. *See Hopkins v. Britton*, 742 F.2d 1308, 1310 (11th Cir. 1984) (holding that "when prison officials are or should be aware of a danger posed to an inmate, they are obligated to take all reasonable steps to protect him, and the failure to do so may be an actionable constitutional wrong").

Because a factual dispute exists as to whether defendant Stephens violated Adams's Eighth Amendment rights by failing to take reasonable measures to protect him from self-harm before placing him in a crisis cell on April 17, 2020, he is not entitled to qualified immunity. Accordingly, defendant Stephens's motion for summary judgment based on qualified immunity is due to be denied.

### 2.   Adams's Continued Confinement in Crisis Cell

Adams alleges that observers informed Sanders, Jones, Jackson, Roy, and Stephens that he was cutting himself during his confinement in the crisis cell between April 17, 2020 and April 23, 2020, but the defendants took no action to remove the razor from his cell or take him to the Health Care Unit for a body chart. (Doc. 16 at 12–14, 23–24). The defendants contend in their respective affidavits that they had no knowledge that Adams was cutting himself or that he needed medical attention. (Doc. 40-3, Sanders Aff. at 1; Doc. 40-4, Jones Aff.; Doc. 40-5, Roy Aff.; Doc. 40-6, Jackson Aff.; Doc. 40-7, Stephens Aff. at 1).

The evidence indicates that observers witnessed Adams cutting himself in his crisis cell on April 20, 2020, at 1:00 a.m., and again on April 23, 2020, at 10:39 a.m. (Doc. 25-2 at 33, 43). Although these records reflect that the observers notified both prison and nursing staff of the incidents, the observers did not indicate which specific members of the prison staff they alerted. (Doc. 25-2 at 33, 43). Adams does not allege that he has personal knowledge that observers

26

informed Sanders, Jones, Jackson, Roy, and Stephens that he had cut himself, and he has not pointed to any other evidence in the record to demonstrate these defendants knew he had a razor in his possession and failed to confiscate it.  Neither does Adams allege in his amended complaint that he personally informed any of these defendants that he possessed a razor, had cut himself, or needed medical attention.

However, Adams now alleges in his recent response, and attached affidavit, that he did personally notify the defendants that he was suicidal and had cut his wrists in his crisis cell.  (Doc. 53 at 2, 6).  Adams's response and affidavit are inconsistent with his amended complaint, made under penalty of perjury, in which he alleged only that he informed mental health observers that he was continuing to self-harm in his crisis cell and the observers, in turn, notified the defendants. (Doc. 16 at 12–14, 23–24).  To the extent Adams now seeks to further amend his complaint with different factual allegations, a response to a motion for summary judgment is not the proper method by which to amend the complaint.  *See Flintlock Const. Services, LLC v. Well-Come Holdings, LLC*, 710 F.3d 1221, 1227–28 (11th Cir. 2013).  And this principle applies even when a plaintiff's new allegations are merely "'additional evidence' rather than 'additional claims.'"  *Mitchell v. Pilgrim's Pride Corp.*, 817 F. App'x 701, 708 (11th Cir. 2020).  Because Adams has not moved to further amend his complaint to allege that he personally informed the defendants that he was cutting himself while confined to the crisis cell between April 17, 2020 and April 23, 2020, these new factual allegations are not properly before the court.

Moreover, Adams has not offered any explanation as to why his factual allegations have changed a year later or why he did not provide this version of events initially in his amended

27

complaint or seek to further amend his complaint sooner.[10] Based on these inconsistencies, and Adams's lack of explanation, the court is not required to entertain these new factual allegations. *See generally Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 656, 657 (11th Cir. 1984) (explaining that "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony").

Viewing the facts that are properly before the court in a light most favorable to Adams, the record is devoid of evidence that defendants Sanders, Jones, Jackson, Roy, and Stephens knew that Adams possessed a razor and posed a substantial risk of serious harm to himself during his confinement in a crisis cell between April 17, 2020, and April 23, 2020. Neither is there evidence that the defendants were aware that Adams needed medical attention during this time and intentionally refused to take him for treatment. Accordingly, defendants Sanders, Jones, Jackson, Roy, and Stephens's motion for summary judgment is due to be granted.

### F.   Injunctive Relief

In addition to damages, Adams requests that this court terminate the defendants' employment. (Doc. 16 at 5, 19). However, "federal courts have no authority to address state officials out of office or to fire state employees or to take over the performance of their functions." *Newman v. Alabama*, 559 F.2d 283, 288 (5th Cir. 1977), *rev'd in part on other grounds by Alabama v. Pugh*, 438 U.S. 781 (1978). Accordingly, Adams's request for injunctive relief is due to be denied.

---

[10] Adams also alleged in his original complaint that mental health observers informed Sanders, Jones, Jackson, Roy, and Stephens that he had cut himself while in the crisis cell. (Doc. 1 at 6). Nowhere in the original complaint does Adams assert that he personally notified these defendants that he had cut his wrists while confined to the crisis cell. (Doc. 1).

## V.  Recommendation

For these reasons, the undersigned **RECOMMENDS** the following:

(1)     Adams's claims against the ADOC be **DISMISSED WITH PREJUDICE**;

(2)     Defendants Spencer, Sanders, Jones, Jackson, Roy, and Stephens's motions for summary judgment be **GRANTED** to the extent Adams seeks damages against them in their official capacities and the claims be **DISMISSED WITH PREJUDICE**;

(3)     Defendant Spencer's motion for summary judgment on Adams's Eighth Amendment claim for deliberate indifference to serious mental health needs be **DENIED**;

(4)     Defendant Wexford's motion for summary judgment be **GRANTED** and Adams's claims against it be **DISMISSED WITH PREJUDICE**;

(5)     Defendant Stephens's motion for summary judgment on Adams's Eighth Amendment claim for failure to protect based on Stephens's failure to search Adams and his crisis cell before placing him in the cell on April 17, 2020 be **DENIED**;

(6)     Defendants Sanders, Jones, Jackson, Roy, and Stephens's motion for summary judgment on Adams's Eighth Amendment claims for failure to protect and deliberate indifference to medical needs based on their alleged failure to remove a razor from his crisis cell and take him for medical treatment between April 17, 2020 and April 23, 2020 be **GRANTED** and the claims be **DISMISSED WITH PREJUDICE**; and

(7)     Adams's request for injunctive relief be **DENIED** to the extent he seeks termination of the defendants' employment.

## VI.  Notice of Right to Object

Any party may file specific written objections to this report and recommendation.  Any objections must be filed with the Clerk of Court within **14 days.**  The objecting party must identify

every objectionable finding of fact or recommendation and state the specific basis for every objection.  The objecting party also must identify every claim in the complaint that the report and recommendation has not addressed.  Objections should not contain new allegations, present additional evidence, or repeat legal arguments.

A party who fails to object to factual or legal conclusions in the Magistrate Judge's report and recommendation waives the right to challenge on appeal those same conclusions adopted in the District Judge's order.  Without a proper objection, however, the court on appeal may review the unobjected-to factual and legal conclusions for plain error if necessary in the interests of justice. 11th Cir. R. 3-1.

After receiving the objections, a District Judge will conduct a *de novo* review of the relevant portions of the report and recommendation and may accept, reject, or modify in whole or in part the Magistrate Judge's findings of fact and recommendations.  The District Judge will conduct a hearing if required by law and may exercise discretion to conduct a hearing or otherwise receive additional evidence.  Otherwise, the District Judge may consider the record developed before the Magistrate Judge in making an independent determination of the relevant legal issues. The District Judge also may refer this action back to the Magistrate Judge with instructions for further proceedings.

A party may not appeal the Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  A party may appeal only from a final judgment entered by a District Judge.

DONE this 15th day of September, 2022.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE